UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

ROBERT H. ARVANITES,                    )    CIVIL ACTION NO.: 6:15-2112-BHH
                                        )
                           Plaintiff,   )
                                        )
            vs.                         )
                                        )            **Opinion and Order**
EXOPACK, LLC; CPG FINANCE, INC.,        )
                                        )
                          Defendants.   )
_____ )

       This matter is before the Court on Defendants' Exopack, LLC and CPG Finance,

Inc. ("Defendants" or "Exopack")[1] Motion for Summary Judgment (ECF No. 26). For the

reasons set forth in this Order, Defendants' Motion is granted in part and denied in part.

## BACKGROUND

       Plaintiff Robert H. Arvanites ("Plaintiff" or "Arvanites") began working for Union

Camp in its packaging division in 1989. (Arvanites Aff., ECF No. 28-1 ¶ 2.) With the

exception of one year, spanning from 2011 to 2012, Arvanites worked for the company

and its successors until he was fired in the spring of 2013. (*Id.* ¶ 2, 4.) When Arvanites

returned to the company in the fall of 2012 it was known as Exopack, and he was

rehired as President of the Pet Foods Packaging Division. (*Id.* ¶ 4.) At that time,

Arvanites entered into a Separation Benefit Agreement, which was amended on

January 7, 2013 and entitled "Amended and Restated Separation Benefit Agreement"

(the "Separation Agreement"). (ECF No. 26-2.) The Separation Agreement provided,

_____

[1] Defendant CPG Finance, Inc. is the indirect parent company of Coveris Flexibles US, LLC. Subsequent to Plaintiff's employment with Exopack, LLC, the company's name was changed to Coveris Flexibles US, LLC. (*See* ECF No. 26-1 at 1 n.1.) For ease of reference, the two entities will be referred to collectively as "Defendants" or "Exopack."

*inter alia*, that Arvanites would be entitled to twelve (12) months of severance pay at his then-existing base salary[2] if Exopack terminated his employment without Cause. (*Id.* ¶ 1.(a).) On the other hand, if Arvanites was terminated for Cause, as that term is defined in the Separation Agreement, then Arvanites would not be entitled to any severance pay. (*See id.* ¶ 1.(a) & (d).) Paragraph 1.(d) of the Separation Agreement defines "Cause" in the following manner:

> For purposes of this Agreement, "Cause" means (A) conviction of the Employee of any felony, or the conviction of the Employee of a misdemeanor which involves moral turpitude, or the entry by the Employee of a plea of guilty or nolo contendere with respect to any of the foregoing, (B) the commission of any act or failure to act by the Employee that involves moral turpitude, dishonesty, theft, destruction of property, fraud, embezzlement or unethical business conduct, or that is otherwise injurious to Parent, the Company or any of their respective subsidiaries or affiliates, whether financially or otherwise, (C) any violation by the Employee of any rule or policy of Parent, the Company or any of their respective subsidiaries or affiliates, (D) any violation by the Employee of the requirements of any other contract or agreement between Parent, the Company or any of their respective subsidiaries or affiliates, on the one hand, and the Employee, on the other hand, and the failure of the Employee to cure such violation under this subsection (D) within then (10) days after receipt of written notice from Parent, the Company, or any of such subsidiaries or affiliates, or (E) any failure by the Employee to abide by any directive of the Board of Directors of Parent or the Company or an officer of Parent or the Company to whom the Employee reports; in each case, with respect to subsections (A) through (E), as determined in good faith by the Board of Directors of Parent or the Company in the exercise of its reasonable business judgment.

(*Id.* ¶ 1.(d).) Defendants maintain that the "Cause" provisions relevant to the instant dispute are subsection (B), which defines Cause as, *inter alia*, "unethical business conduct, or that is otherwise injurious to [Defendants], whether financially or otherwise," and subsection (C), which defines Cause as "any violation by the Employee of any rule or policy of [Defendants]." (*Id.*; ECF No. 26-1 at 2-3.) In each case, the determination as

---

[2] Arvanites' base salary was $266,500 at the time he was terminated. (Arvanites Aff., ECF No. 28-1 ¶ 5.)

to whether Cause is present is to be made in good faith by the Board of Directors according to "reasonable business judgment." (ECF No. 26-2 ¶ 1.(d).)

The Exopack policies relevant to this dispute are the Confidentiality and Employee Inventions Agreement ("Confidentiality Agreement") (ECF No. 26-3), and the Code of Business Conduct Policy ("Conduct Policy") (ECF No. 26-4), both of which were received and executed by Arvanites upon his rehiring.[3] As already indicated, violation of any provision contained in the Confidentiality Agreement and the Conduct Policy, as determined in good faith by the Board of Directors in the exercise of reasonable business judgment, constitutes Cause under the Separation Agreement.

The Confidentiality Agreement states in pertinent part, "Employee shall keep confidential and not make any unauthorized use or publication of, or disclose any Confidential Information (as hereinafter defined), except to the extent that disclosure of the information is necessary to fulfill Employee's responsibilities as an Employee of the Company." (ECF No. 26-3 ¶ 1.) The Confidentiality Agreement defines "Confidential Information" broadly, to include, among other things, "all information . . . which the Company . . . could reasonably be expected to desire to be held in confidence, or the disclosure of which could conceivably be embarrassing, detrimental or disadvantageous to the Company or any of its affiliates." (Id. ¶ 1.a.)

The Conduct Policy provides in pertinent part, "These standards are applicable to every employee, officer, director, and agent of all Exopack companies. You should be aware that complying with this Statement and all other Internal Policies is a condition of your employment . . . ." (ECF No. 26-4 at 2.) Defendants assert that the provisions of

---

[3] The copy of the Conduct Policy attached to Defendants' Motion does not contain Arvanites' signature (see ECF No. 26-4); however, Plaintiff does not dispute that he received and signed the Policy.

the Conduct Policy relevant to this lawsuit are those pertaining to the duty of loyalty and conflicts of interest. (*See id.* at 6, 10.) They point specifically to the following language from the Conduct Policy, "Each employee is expected to avoid any influence, interest, association or relationship that interferes, might interfere or might appear to interfere with the employee's independent exercise of judgment in Exopack's best interest." (*Id.* at 10.)

On January 10, 2013, Defendants granted to Plaintiff stock options that would vest at certain times and upon certain conditions. (*See* Stock Option Memorandum, Stock Option Grant Agreement, and Stock Option Plan, ECF No. 26-5.) The parties executed several documents in conjunction with the stock option award, most pertinent of which is the "Stock Option Grant Agreement." (*Id.* at 3-5.) The Stock Option Grant Agreement provides that 20% of the total number of shares offered to Arvanites would vest on September 10th of each year, beginning with the first such vesting occurring on September 10, 2013, and continuing each year thereafter until fully vested. (*Id.* ¶ 6.) The Agreement further provides that Arvanites must be employed at the time of the vesting in order to receive the stock award. (*Id.* ¶ 6.c.(iv).) Arvanites was terminated by Exopack in June 2013, prior to any such vesting. (Arvanites Aff., ECF No. 28-1 ¶ 6.)

Arvanites filed the instant lawsuit in the Court of Common Pleas, Greenville County on April 14, 2015. (Compl., ECF No. 1-1 at 4-7.) He alleged that sometime in the first half of 2013, Defendants decided to enter into a corporate finance transaction that would have vested the stock options and severance benefits to which he was entitled unless he was fired for cause. (*Id.* ¶ 12.) Arvanites further alleged that Defendants, through Fred Fratto ("Fratto"), Chief Human Resources Officer of Exopack, and Jack

4

Knott ("Knott"), Chief Executive Officer of Exopack, launched an unfounded investigation based on false grounds of alleged misconduct in order to unjustly deprive him of the stock options and severance benefits. (*Id.* ¶ 13.) Arvanites advanced one cause of action for breach of contract, premised on the theory that Defendants were required to pay him severance benefits and failed to do so (*see id.* ¶¶ 15-19), and another cause of action for declaratory judgment, requesting the Court to declare that his stock options are fully vested and his rights therein continue to exist and are unimpaired (*see id.* ¶¶ 20-26). Defendants removed the case to this Court on May 22, 2015, pursuant to 28 U.S.C. §§ 1332 and 1446. (ECF No. 1.)

Defendants filed a Motion for Summary Judgment on February 9, 2016, arguing (1) that Plaintiff's breach of contract claim fails because Plaintiff admitted he violated company policy which is grounds for termination for Cause under the Separation Agreement, and (2) that Plaintiff's declaratory judgment claim fails because, by Plaintiff's own deposition testimony, the stock option award was not vested at the time he was terminated. (ECF No. 26-1 at 1.) Plaintiff responded on February 26, 2016 (ECF No. 28), and Defendant replied on March 7, 2016 (ECF No. 29). Defendants also filed a Supplemental Memorandum in Support of the Motion for Summary Judgment on August 31, 2016, arguing that recently obtained deposition testimony further forecloses the viability of Plaintiff's breach of contract claim. (ECF No. 40 at 1, 4-6.) The Court has thoroughly reviewed the parties' briefs and relevant portions of the record, and now issues the following ruling.

## **LEGAL STANDARD**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the Court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. "Genuineness" of the disputed issue(s) "means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

### Breach of Contract

Plaintiff's first cause of action alleges that Defendants breached the Separation Agreement by not paying him severance benefits to which he was entitled. (ECF No. 1-1 ¶¶ 15-19.) Under South Carolina law, "[t]he elements for breach of contract are the existence of the contract, its breach, and the damages caused by such breach." *Branche Builders, Inc. v. Coggins*, 686 S.E.2d 200, 202 (S.C. Ct. App. 2009) (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (1962)). The existence of the contract (the Separation Agreement) and putative damages (non-payment of severance benefits) are not in dispute. Rather, the crux of the parties' dispute centers on whether Exopack committed a breach, which turns on whether Arvanites was terminated for Cause or whether Exopack's assertions of Cause were unfounded and/or pretextual.

Defendants argue that the evidence of record overwhelmingly demonstrates that Arvanites was terminated for Cause, and that he therefore had no entitlement to severance pay. In support of this assertion, Defendants submit the Affidavit of Susan

Elles ("Elles"), who served as Executive Assistant to Arvanites during his tenure as President of the Pet Foods Packaging Division at Exopack. (Elles Aff., ECF No. 26-6 ¶ 1.) Elles describes various instances where Arvanites is alleged to have inappropriately expensed the cost of events and purchases, asserting these costs should not have been borne by Exopack because they were not actually business-related expenses. (*Id.* ¶¶ 3-6.) She further states that Arvanites did not keep the office hours typical of other executives in similar positions at Exopack, often arriving at the office between 10 a.m. and noon, and that he was regularly unreachable when other Exopack executives were trying to get ahold of him, putting her in an awkward position when she was questioned by one Human Resources officer about why he could not be reached. (*Id.* ¶ 7.)

On May 16, 2013, Fratto notified Arvanites by letter that Exopack had received information suggesting that Arvanites may have violated company policies, including: (1) falsifying expense reports and/or seeking reimbursement for non-business-related costs, (2) disclosing confidential information concerning the Company to person(s) outside the Company, and (3) deleting or otherwise destroying Company information (including emails) that could be relevant to the foregoing. (ECF No. 26-7.) The letter further informed Arvanites that an immediate investigation would ensue and instructed that he was not to interfere with or attempt to influence the investigation in any manner. (*Id.*)

During the course of the investigation, email correspondence was discovered that showed Arvanites sent information regarding Exopack's financial performance to Brad Hettlinger, a recently discharged Exopack executive, who was in the midst of

severance negotiations with Exopack. (*See* ECF No. 26-8.) A financial performance summary sent by CEO Knott to Arvanites, which was included in the correspondence that Arvanites forwarded to Hettlinger, warned, "As a reminder, the company's financial results are to be kept confidential." (*Id.* at 4.) When Arvanites forwarded the information to Hettlinger he wrote, "Obviously personal and confidential. FYI only." (*Id.* at 2.) The correspondence also showed that Arvanites drafted a short request for Hettlinger, to be sent to Exopack management, asking for additional severance compensation. (*See id.* at 10-11.)

In his deposition, Arvanites acknowledged that he sent the financial information with the knowledge that it was confidential pursuant to company policy, and that he should not have sent it out. (Arvanites Dep., ECF No. 26-9, p. 58, ll. 7-11.) Defendants cite the following question and answer exchanges from the deposition as evidence of Arvanites admitting he violated his duty of loyalty to Exopack:

> Q: Do you think it would be detrimental to a company that you worked for, to try to help someone who'd been let go to negotiate themselves a higher severance?
>
> A: Potentially, yes.

(Arvanites Dep., p. 42, ll. 21-25.)

> Q: Would you agree, that's not being loyal to the company when you're trying to help somebody, who's been let go, negotiate a higher severance?
>
> A: Yes.

(*Id.*, p. 43, ll. 5-10.)

> Q: But would you agree that having to pay more severance, or helping somebody argue that they should get more severance, would be injurious to your company?
>
> A: If it was granted to them, yes.

Q: And what about, would it be in violation of a company policy – the Code of Ethics that we just talked about, the loyalty to the company?

A: Again, poor judgment.

Q: Is that a yes?

A: Yes.

(*Id.*, p. 45, l. 23 – p. 46, l. 8).[4] Based on this deposition testimony, Defendants argue that Arvanites conceded multiple violations of company policy in the form of sending confidential information to Hettlinger and helping Hettlinger negotiate better severance compensation. (ECF No. 26-1 at 6.) This conduct alone, Defendants aver, was sufficient to justify Arvanites' termination *for cause*. (*Id.*)

In addition to investigating the disclosure of Exopack's confidential information, Exopack hired a forensic accounting firm, Sunera, LLC ("Sunera"), to investigate the validity of expense reports submitted by Arvanites. Sunera prepared a report dated June 3, 2013, which detailed its investigation and findings. (Sunera Report, ECF No. 26-10.) Sunera's conclusions included, but were not limited to, the following: (1) Arvanites expensed a flight to Boston, stating that the business reason was for a work-related conference, but further inquiry revealed that the conference he referenced took place on different dates in Montreal, Quebec, and the Boston trip should not have been submitted for reimbursement because it was personal in nature; (2) Arvanites expensed the purchase of "Quail" approximately one week prior to the Boston trip, claiming it was intended to be cooked for a pre-memorial day town hall meeting at a company facility in Spartanburg, but Exopack staff confirmed that no quail was served at the town hall

---

[4] In an apparent oversight, Defendants neglected to attach pages 42-46 of Arvanites' deposition as exhibits to the Motion for Summary Judgment. However, Plaintiff has not contested the accuracy of these quotations, making the failure to attach the corresponding deposition pages immaterial.

meeting, and email correspondence from a friend thanked Arvanites and his wife for providing and cooking quail at a party during the weekend of the Boston trip; and, (3) travel itineraries for Mr. and Mrs. Arvanites and Paul Pelletier ("Pelletier") and his wife, along with associated emails, show that Arvanites planned a trip to the Grove Park Inn, in Asheville, North Carolina, for the four of them, but switched Pelletier's name on the itinerary that he submitted for reimbursement to the name Will Turnipseed ("Turnipseed"), who did not attend the trip, in order to make it appear as if the trip were business related. (*Id.* at 2-3.) Regarding this third conclusion, the Sunera Report stated:

> [I]t is troubling that the name on the itinerary would be changed from what was automatically generated from Exopack's travel and expense system. Sunera spoke with Mr. Turnipseed on the morning of June 3, 2013 and confirmed that Mr. Turnipseed did not attend any such function as a guest of Exopack on these or any other dates. Evidence indicates that this was a personal trip for Mr. Arvanites and his wife and friends and that false information was provided to Company management more than once to obtain reimbursement as if the trip were business related.

(*Id.* at 3.) During his deposition, Arvanites admitted that he altered the Grove Park Inn itinerary by substituting Turnipseed's name for Pelletier's name on the computer-generated itinerary at some point prior to submitting it with the expense report. (Arvanites Dep., ECF No. 26-11, p. 85, l. 17 – p. 86, l. 12.)

Turnipseed was the Commercial Sourcing Manager—Dry Packaging of Mars Petcare US, Inc., a corporate customer of Exopack. (ECF No. 26-10 at 6.) In his affidavit, Turnipseed states that he never attended a trip to the Grove Park Inn with Arvanites, nor was he invited to attend such a trip by Arvanites or as a guest of Exopack at any time. (Turnipseed Aff., ECF No. 26-15 ¶¶ 3-4.) He further states, "I understand Mr. Arvanites represented that I accepted an invitation for my wife and myself to join he and his wife in Asheville as a guest of Exopack, but then cancelled. I was not invited to

any such weekend . . . nor did I cancel any invitation I accepted from Mr. Arvanites." (*Id.* ¶ 5.) During his recent deposition, Turnipseed testified that he and his wife did not know that Arvanites represented to Exopack that they were treated to a weekend at the Grove Park Inn with Mr. and Mrs. Arvanites until he received a telephone call from a Sunera forensic accountant. (Turnipseed Dep., ECF No. 40-1, p. 9, ll. 12-17, p. 10, ll. 5-21.)

Turnipseed further testified to another incident when Arvanites called him and asked him to vouch to Exopack that Arvanites bought him an eighty dollar ($80) bag that Arvanites was going to submit for reimbursement on an expense report. (*Id.*, p. 11, ll.1-20.) Turnipseed confirmed that he never received any bag from Arvanites. (*Id.*, p. 11, ll. 24-25.) Turnipseed conceded that he lied on Arvanites' behalf to the Sunera forensic accountant when he was originally asked about the bag. (*Id.*, p. 18, l. 13 – p. 19, l. 6.)[5] When asked why he initially falsely vouched for Arvanites regarding the bag, but not the Grove Park Inn Trip, Turnipseed stated, "Well, for me there's a heck of a difference between an $80 backpack and a weekend trip at Grove Park Inn in Asheville, North Carolina, with me and my wife." (*Id.*, p. 22, ll. 11-18.) In actual fact, Arvanites expensed the Tumi bag in question for four hundred ninety-five dollars ($495), which Sunera concluded was arguably a permissible business expenditure under Exopack's company policies due to Turnipseed's initial misrepresentation. (ECF No. 26-10 at 4.) Referring to the same Tumi bag, Elles stated in her affidavit that Arvanites asked her if he could expense the designer briefcase as his computer bag; when she told him it was

---

[5] This alleged request by Arvanites to Turnipseed to lie about the purchase of luggage on his behalf is not a proper consideration when evaluating whether the Board of Directors' determination of just Cause was reasonable and made in good faith. At the time the Board terminated Arvanites, the Sunera Report represented that the bag purchase *was not* in direct violation of company policy, though perhaps questionable as an exercise of discretion when spending company funds. (*See* ECF No. 26-10 at 4.) In any event, the Board had *no indication* that Turnipseed had lied on Arvanites' behalf, or that Arvanites allegedly asked him to do so. This is not to say that Turnipseed's allegation, if substantiated, will not be relevant at later stages of the case on the more general issue of Arvanites' credibility.

against company policy to purchase computer bags, he later submitted an expense report showing the same bag supposedly purchased for a customer (Turnipseed), though she had not shipped the bag to any customer as she usually would have done on Arvanites' behalf. (ECF No. 26-6 ¶ 5.) Elles further stated that she would have known if the bag had been shipped because she did all the shipping for Exopack's executive office. (*Id.*)

On June 10, 2013, Fratto delivered a termination letter to Arvanites that stated, "This letter confirms our conversation of today's date that Exopack, LLC . . . has decided to terminate your employment effective immediately for 'Cause,' as specified in Section 1(d) of the Amended and Restated Separation Benefit Agreement . . . ." (ECF No. 26-17 at 2.) The termination letter further stated:

> As you know, the Company has conducted an investigation concerning several highly questionable items going through your time and expense reports. Based upon the results of this investigation, the Board of Directors of the Company has determined in the exercise of its reasonable business judgment that you have engaged in actions that involve dishonesty, theft, fraud, and/or unethical business conduct and/or that violate Company rules or policies. These actions include but are not limited to (1) falsifying expense reports and/or seeking reimbursement for non-business-related costs, (2) disclosing confidential information concerning the Company to persons outside the Company, and (3) deleting or otherwise destroying, or attempting to delete or destroy, Company information (including emails) that may be relevant to the aforementioned misconduct.

> Because your employment is terminated for Cause, you are not entitled to any of the separation benefits provided in Section 1 of the Separation Agreement. You will receive your final paycheck, which will include all compensation and any accrued but unused vacation through the date of termination (less all applicable withholdings and payroll taxes), on or before June 30, 2013, which is the regular payroll cycle.

(*Id.*) Plaintiff has not alleged that Defendants breached the contract *in any other way* than failing to pay him severance benefits. (*See* ECF No. 1-1 at 4-7.)

From the foregoing factual basis, Defendants argue that Plaintiff's breach of contract claim fails as a matter of law because Arvanites was terminated for Cause as defined by the Separation Agreement and as supported by his own admissions. (ECF No. 26-1 at 10.) Paragraph 8 of the Separation Agreement states that Delaware law governs the contract. (ECF No. 26-2 at 8.) Delaware law provides, "When the language of a contract is plain and unambiguous, the intent of the parties expressed in that language is binding." *Sun-Times Media Grp., Inc. v. Black*, 954 A.2d 380, 389 (Del. Ch. 2008) (citing *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992)). South Carolina law is in accord, "When a contract is unambiguous, clear, and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary, and popular sense." *Sphere Drake Ins. Co. v. Litchfield*, 438 S.E.2d 275, 277 (S.C. Ct. App. 1993) (*C.A.N. Enterprises, Inc. v. South Carolina Health and Human Services Finance Comm'n*, 373 S.E.2d 584 (S.C. 1988)). Absent ambiguity in contractual language, parties are bound to the plain meaning of contractual terms "'because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented. . . .'" *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

Defendants argue that there are multiple independent bases which establish that Arvanites' termination was grounded on legitimate findings of Cause. First, Arvanites admitted in his deposition (1) that the emails he sent to Hettlinger contained confidential information as defined under the Confidentiality Agreement; (2) that assisting a

discharged employee with severance negotiations could be detrimental to the company's interests; and (3) that such assistance could constitute disloyalty under the Conduct Policy if the company ended up paying more severance to the discharged employee as a result of the negotiations. (ECF No. 26-1 at 10-15.) Second, statements made by Arvanites in his deposition (specifically regarding his alteration of the Grove Park Inn trip itinerary) establish that he submitted fraudulent expense reports in violation of company policy, though Arvanites maintains that he did nothing wrong. (ECF No. 26-1 at 15-16.) Accordingly, aver Defendants, a plain and unambiguous reading of what constitutes Cause under the governing contract demonstrates that Defendants did not breach the Separation Agreement by failing to pay severance benefits.

Defendants further argue that South Carolina case law supports the conclusion that Plaintiff's infractions constituted just Cause such that the Board of Directors was justified in its decision. Defendants cite *Prescott v. Farmers Tel. Co-op., Inc.*, 491 S.E.2d 698 (S.C. Ct. App. 1997), for the proposition that when courts seek to determine whether an employer breached an employment contract by terminating an employee, "the test is not whether the employee actually committed misconduct, but whether the employer had a reasonable good faith belief that it had cause to terminate." *Id.* at 705, *rev'd on other grounds*, 516 S.E.2d 923. "Thus," Defendants assert, "the Court will analyze whether Exopack had a good faith belief that it had 'just cause' to terminate Arvanites under the Separation Agreement." (ECF No. 26-1 at 12.)

Finally, Defendants cite the "business judgment rule" in support of the assertion that this Court should give deference to the Exopack Board's good-faith determination that there was just Cause to terminate Arvanites. (ECF No. 26-1 at 16-17.) Delaware

law has explained the application of the business judgment rule to a corporate board of directors in the following manner:

> The business judgment rule, as a standard of judicial review, is a common-law recognition of the statutory authority to manage a corporation that is vested in the board of directors. The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. An application of the traditional business judgment rule places the burden on the party challenging the board's decision to establish facts rebutting the presumption. The effect of a proper invocation of the business judgment rule, as a standard of judicial review, is powerful because it operates deferentially. Unless the procedural presumption of the business judgment rule is rebutted, a court will not substitute its judgment for that of the board if the board's decision can be attributed to any rational business purpose.

*Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 927-28 (Del. 2003) (internal citations, alterations, and quotation marks omitted). Consequently, assert Defendants: (1) the burden is on Plaintiff to rebut the presumption that Exopack's Board of Directors acted in an informed manner and in good faith, and (2) Plaintiff cannot do so because there is clearly a rational business purpose (e.g., violation of company policies, disclosure of confidential information, disloyalty, dishonesty on expense reports) for the decision to terminate Arvanites. (ECF No. 26-1 at 17.)

Here, the Court would note that the *Prescott* case actually weighs against, not in favor of, Defendants' Motion for Summary Judgment. Defendants inexplicably neglect to include the sentence from the *Prescott* opinion immediately prior to the one they quote. As the Supreme Court of South Carolina has explained, "The appropriate test on the issue of breach is as follows: 'If **the fact finder** finds a contract to terminate only for cause, **he must determine** whether the employer had a reasonable good faith belief that sufficient cause existed for termination.'" *Conner v. City of Forest Acres*, 560 S.E.2d

606, 611 (2002) (quoting *Prescott*, 491 S.E.2d at 705) (emphasis added). Just like the *rule* set forth in *Prescott*, the *result* in that case is similarly unavailing to Defendants. After stating the rule on which Defendants seek to rely, the *Prescott* court held that a genuine issue of material fact remained regarding whether the employer had a reasonable good faith belief that cause existed for the termination, and reversed the trial court's entry of summary judgment. *Prescott*, 491 S.E.2d at 705.[6] Likewise, it is the fact finder, not this Court at the summary judgment stage, that must determine whether the Board of Directors' decision to terminate Arvanites for Cause was made in good faith and in the exercise of reasonable business judgment. Of course, there is always the possibility that the factual record is so one-sided at the summary judgment stage that there is no genuine, material issue remaining for the fact finder's consideration. This is, in essence, what Defendants argue in their Motion.

Plaintiff responds that Exopack fabricated reasons to justify his termination for "Cause," and that, upon scrutiny, each of the reasons is false. (ECF No. 28 at 1.) As a result, argues Plaintiff, various disputes over genuine issues of material fact remain and the Court should deny Defendants' Motion. (*Id.* at 2.)

First, Plaintiff asserts that the real reason he was fired was because he called the shortcomings of Chief Human Resources Officer Fratto to the attention of Exopack upper management. (ECF No. 28 at 2-3.) Plaintiff supports this assertion with his own affidavit, stating, "[Fratto] was embarrassed and retaliated by creating political intrigue against me." (ECF No. 28-1 ¶ 6.) The alleged basis for this embarrassment was notes

---

[6] This holding was later overturned by the Supreme Court of South Carolina for reasons irrelevant to the case *sub judice.* Specifically, the court held that an employer's alleged oral offer stating that an employee would have a job as long as he "kept his nose clean" and "did his job" was not sufficiently explicit to constitute an offer to limit termination to just cause, and therefore did not alter the employee's at-will employment status. *Prescott v. Farmers Tel. Co-op., Inc.*, 516 S.E.2d 923, 926 (1999).

from an "Executive Team" meeting designed to seek feedback from employees, which Arvanites sent to Knott and Fratto in order to help improve employee morale and align employees to Exopack's strategic vision. (*See* ECF No. 28 at 3.) Plaintiff failed to attach any such notes, which putatively cast Fratto in a negative light, to his Response; neither has he produced them at any time during the course of this litigation. (*See* Defs. Reply, ECF No. 29 at 1.) At this time, the Court has no evidentiary basis outside of Arvanites' affidavit to conclude that the notes exist, let alone that the content of the notes was sufficiently embarrassing to Fratto as to motivate him to gin up a sham investigation. Thus, this alternative reason that Arvanites provides for his termination remains speculative at this juncture.

Second, Plaintiff argues that he was fired because Exopack was planning to close his division's headquarters in Spartanburg, South Carolina, and consolidate it with other parts of the company located in Luxembourg and Chicago. (ECF No. 28 at 3.) Again, Plaintiff supports this allegation with his own affidavit, which states that "[the consolidation] occurred in the fall of 2013, after I was terminated in June of that year." (ECF No. 28-1 ¶ 6.) The Court has not been presented with any evidence of record to show a direct connection between his termination and the consolidation of various portions of Exopack's business; however, the theory is at least plausible that a desire to thin out the executive leadership team in advance of corporate consolidation led Exopack management to capitalize on allegations of misconduct made against Arvanites and to commence a formal investigation where they otherwise might not have. Assuming for a moment the truth of such a theory, the Court notes that it would be unsurprising for a plaintiff in Arvanites' position to have to build evidentiary support on a

series of circumstances and inferences, as the likelihood of uncovering a "smoking gun," where senior executives at a large corporation let slip the "real reason" why they are seeking to fire a colleague, seems very low.

In his affidavit, Plaintiff claims that "[i]n order to mask what he was doing, Fratto hired an outside company, Sunera, to pretend that it was conducting an impartial inquiry. In fact, it was cover for dirty work by Fratto and his lieutenants." (ECF No. 28-1 ¶ 7.) Plaintiff attaches a series of email communications between himself and various Exopack employees, including Knott and Fratto, as support for this claim. However, a review of the emails reveals that Plaintiff is largely the source of any inference that Fratto's actions were motivated out of personal animus. (*See* ECF No. 28-4.)

Plaintiff avers that Sunera was not an "independent" firm hired by Exopack for the purpose of investigating Arvanites because "Exopack had used Sunera for other projects and investigations." (ECF No. 28 at 5.) Plaintiff insinuates that the timing of Sunera's investigation is suspect because it was approximately ten days after Arvanites allegedly embarrassed Fratto that Exopack emailed Sunera requesting that the firm investigate Arvanites' conduct. (ECF No. 28 at 5.) While there does not appear to be any direct evidence to support the assertion that Sunera's independence as a forensic accounting firm can be legitimately questioned, the Court finds some of the communications between Exopack and Sunera personnel troubling with regard to how much of the accounting firm's report was actually generated by Exopack and merely placed on Sunera letterhead to give the appearance of a third-party source.

Plaintiff cites email exchanges between Carla Stucky, Exopack's Chief Accounting Officer, and Natalie Little, the Partner at Sunera in charge of the

investigation, as demonstrative that the Sunera Report was simply an official-looking cover for Knott and Fratto's surreptitious motivation to have Plaintiff fired by the Board. Specifically, on May 28, 2013, twelve days after Arvanites was notified that he was under investigation, Ms. Stucky wrote to Ms. Little:

> I am going to need that write up tomorrow. Maybe I can draft a more formal memo for you to look at and you guys can let me know if I missed anything and can bless it (just to save time). I have to get something to Jack [Knott] and Mike [Alger, Exopack's Chief Financial Officer,] tomorrow. *Important thing is that the memo comes from Sunera, but I can help speed up the process so Jack is happy.*

(ECF No. 28-3 at 11 (emphasis added).) Ms. Little responds shortly thereafter:

> Carla,
>
> That is fine. I was just reading through your analysis compared to what Rebecca [West] listed out on her issue list (her summary was ready on Friday – I was just reviewing it). We had a couple more minor things to add but we can just add them to your latest memo draft tomorrow morning and have you review the changes. If that method is okay by you, that will work for us and I can turn it quickly. *Your memo is probably the better starting point anyway since your access to the emails allows a bit more depth to the details that we haven't been able to access.*
>
> We noted there were some months with no T&E reports. Were there no reports from Sept – March (Rebecca to clarify if I have these dates correct)?
>
> *Do you need us to drill down in his emails at this point or do you feel those have been combed through thoroughly at this point?*

(*Id.* at 10 (emphasis added).) Ms. Stucky then drafted the memorandum and sent it to Ms. Little on May 29, 2013, writing, "Natalie, here is the memo, can you please review quickly and get back to me? Also, can you put on Sunera letterhead (assuming you agree to everything being said and have added any of your additional items/tweaks)." (*Id.* at 13.) Prior to adopting the May 29, 2013 memo as Sunera's own work product, Ms. Little asked another Sunera employee who was working on the investigation,

Rebecca West, "Is there any evidence [Ms. Stucky] mentions in the memo that we ourselves have not seen? If so, can we ask her to send it over quickly *since we are representing that we did this ourselves*?" (*Id.* at 14 (emphasis added).) Ms. West responds, "Yes, I was going to include that in my reply to you. *In points # 1, 2, 6 (name changes for the hotel in the system) and 7, I have not seen those emails or correspondences.*"[7] (*Id.* (emphasis added).) The final Sunera Report was dated June 3, 2013 and included the May 29, 2013 memo as an attachment (*see* ECF No. 26-10 at 5-9), along with the itemized expense reports and Arvanites' emails deemed relevant to the investigation (*see* ECF No. 26-10 at 10-101). A review of the conclusions drawn in the Sunera Report reveals that they are based upon, indeed often borrow language verbatim from, the preliminary conclusions in the May 29, 2013 memo. (*Compare* Sunera Report ¶¶ 1-6, ECF No. 26-10 at 2-4, *with* May 29 Memo ¶¶ 4-8, 12, ECF No. 26-10 at 6-8.)

In full candor, upon initially reviewing the briefing and the evidence, the Court was rather unconvinced that a few cherry-picked portions of an email chain between Exopack and Sunera personnel raised sufficient doubt regarding the Report's seemingly inexorable conclusions to rise to the level of a "genuine" dispute sufficient to prevent the entry of summary judgment. After all, the old adage "where there's smoke there's fire"

---

[7] It is important to note that "points . . . 6 (name changes for the hotel in the system) and 7," referenced here by Ms. West, correspond to Arvanites' alleged infractions with respect to (6) altering the Grove Park Inn trip itinerary, and (7) breaching duties of confidentiality and loyalty through his communications with Hettlinger, respectively. (*See* ECF No. 26-10 at 7-8.) Indeed, these are the two "major" infractions upon which Defendants stake their claim that a finding of termination "for Cause" is indisputable. (*See generally*, ECF No. 26-1 at 4-8, 10-16.) It is indeed curious that on May 29, 2013, Sunera is preparing to adopt various preliminary conclusions about Arvanites' alleged misconduct as its own conclusions *without ever having seen the evidence* that purportedly substantiates those conclusions. It is equally curious that Ms. Stucky, apparently, fully expects Sunera to adopt these conclusions, which she drafted, not Sunera, *without ever having forwarded* the relevant documents for Sunera's consideration. In this context, it is not difficult to understand why Plaintiff views the Sunera Report as "hardly an independent investigation," but rather "an *ex post facto* report generated to support whatever reasons Exopack could cobble together to support its termination for 'cause' . . . ." (ECF No. 28 at 6.)

may be true, but it does not always follow that where there is kindling there is smoke. However, a closer review of Ms. Stucky, Ms. Little, and Ms. West's emails raised legitimate concerns in the Court's mind as to whether the conclusions supposedly drawn by Sunera were foregone before Sunera even saw the relevant evidence (see note 7 *supra*). And then the Court grasped the significance of an email from Exopack's outside counsel, Ronald Moffit of Stoel Rives LLP, to Ms. Stucky and Ms. Little, copying Fratto and Knott. (Arvanites Aff., Ex. E, ECF No. 28-1 at 32.) On May 30, 2013, after reviewing the memo drafted by Ms. Stucky, Moffit advises Ms. Little regarding follow-up actions in the investigation:

> I would not send a separate email to Will Turnipseed yet. From his perspective this should be a "routine" call. Further, he represents a large client and I don't think we want him to feel like we are hounding him. If he doesn't return a call today or early tomorrow, then I think you could send him an email – "just following up, wondering if you might have time to talk to me" kind of message.
>
> As for the hotel, again let's wait to see what we can find out from Will.
>
> ***It's my understanding that we aren't going to terminate Bob until the week after next, when Jack and Fred are back from London. So, I feel like we have a few days to try to get the information on a low-key basis.***

(*Id.*) This statement lends itself to a plausible inference that the decision to terminate Arvanites was made not only before the Board had convened, but before Sunera had even interviewed Turnipseed or completed its report. (*See* Arvanites Aff., ECF No. 28-1 ¶ 14.) In this context, and given Arvanites' feeling that he was denied "a meaningful opportunity to defend Exopack's allegations" during the investigation, it is no wonder that he argues the Board of Directors' subsequent action "was not a decision" but rather "an *ex parte* rubber stamp." (ECF No. 28 at 6.)

As with any summary judgment motion, "the court must draw any permissible inference from the underlying facts established in the record in the light most favorable to the non-moving party." *Austin v. Clark Equipment Co.*, 48 F.3d 833, 835 (4th Cir.1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)). And, "it is the province of the [fact finder] to resolve conflicting inferences from circumstantial evidence." *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995) (quoting *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958)) (quotation marks and alteration omitted). With this perspective in mind, and continuing the above analogy, Moffit's email leads the Court to conclude that the kindling of Arvanites' theory is at least smoldering. It would be disingenuous for the Court to say that it was construing all inferences in Plaintiff's favor if the Court simply ignored the questions raised by the emails between Ms. Stucky, Ms. Little, Ms. West, and Mr. Moffit. Defendants essentially ask the Court to disbelieve Arvanites' assertions that the investigation was biased from the beginning and commenced with a particular endstate in mind, and to believe their own assertion that the finding of Cause was virtually axiomatic. But as Defendants well know, it is not the province of the Court to make credibility determinations at the summary judgment stage. By declining to do so, however, the Court makes no comment upon the relative strength of the parties' positions on the merits given the evidence.

Plaintiff denies any wrongdoing with respect to his actions. In his Response, he walks through and gives allegedly innocent explanations for many of the infractions that led to findings in the Sunera Report that he violated company policies. With respect to expensing the quail, he maintains (1) that he bought it to entertain Exopack employees

and customers;[8] (2) that it was different quail than the quail he cooked on the weekend of the Boston trip; (3) that he was fired before he had the chance to use the quail for a business-related event; (4) that the unused quail remained in his freezer for approximately one year after he was terminated; and (5) that Exopack could have asked for and had the food back after it fired him, but it never asked. (ECF No. 28 at 4; ECF No. 28-1 ¶ 9; Arvanites Dep., ECF No. 28-10 p. 79, l. 1 – p. 80, l. 22.)

Regarding the Grove Park Inn trip, Arvanites claims that he (1) casually invited Turnipseed in order for Turnipseed to meet one of Exopack's suppliers (Pelletier) and put together a program that would benefit all three businesses; (2) that all of their wives were to go as well; (3) that he never issued a formal invitation and Turnipseed may not remember the informal one; (4) that the weekend trip was a "business meeting for the benefit of the company"; and (5) that because of the stress of being fired soon afterwards, he simply forgot to reimburse the company for Pelletier's room expense, which Pelletier paid to him by personal check in the amount of $309.23. (ECF No. 28 at 4; ECF No. 28-1 ¶ 10; ECF No. 40-2 at 6.) Arvanites attaches an email, adopted as "true and correct" in Pelletier's affidavit, from Pelletier to Arvanites' counsel in which Pelletier writes:

> I am sending this email in response to your questions about an offsite meeting Bob Arvanites (then of Exopack) and I conducted on the weekend of April 27 and 28, 2013 in Asheville, NC. The purpose of this meeting was to discuss at length a supply chain management services arrangement that I was in the midst of proposing to Exopack, which essentially amounted to the outsourcing of Exopack's coated paper technical qualification and procurement functions.
>
> An arrangement of the type I was proposing had never been considered, let alone implemented, by a U.S. multiwall bag packaging company like

---

[8] Arvanites made the purchase in question on April 17, 2013 for "36 Whole Quail Bone-In," in the amount of $92.99. (ECF No. 26-10 at 69.)

> Exopack, and it represented a major change in Exopack's operating model relative to coated paper supply. As a result the discussions concerning how the proposal would impact / benefit both Exopack and its largest customers were long and involved.
>
> On April 25th and 26th, I met and discussed our proposal with several Exopack managers (including Bob) at the Spartanburg headquarters location and bag plant. On April 27th, accompanied by our wives, Bob and I then drove to Asheville to continue these discussions. We did so that afternoon, over dinner that evening and at breakfast the next day, following which my wife and I departed Asheville [sic].

(ECF No. 28-12 at 2.) In his deposition, Arvanites conceded that Pelletier did not have a business partnership with Exopack of the type where he would expect the company to entertain Pelletier at the company's expense:

> Q. So he wasn't somebody whose business you were trying to get—or keep.
>
> A. Well suppliers, we typically alternated; but I would never, traditionally, buy him a hotel room. I would – traditionally we would just pay for meals for each other, just in the spirit of a supplier/customer relationship.
>
> Q. Right. But he's not a customer that Exopack considered as somebody you'd need to entertain like Will Turnipseed was.
>
> A. Correct. Not for, like, a hotel room, no. You would never expect that.

(*See* ECF No. 29 at 4.)[9] Nevertheless, Plaintiff maintains that the content of his interaction with Pelletier over the course of the weekend justified him submitting the cost of *his own travel* for reimbursement as a business related expenditure (s*ee* ECF No. 28 at 12-13), and Pelletier's email lends at least some support to this notion.

As Defendants would present it, Arvanites' admission to changing Pelletier's name to Turnipseed's name on the computer-generated travel itinerary is an indisputable smoking gun showing that Arvanites falsified an expense report, and then

---

[9] Again, Defendants failed to attach page 88 of Arvanites' deposition, from which they are apparently quoting. However, Plaintiff has not contested the accuracy of this quotation, so the lack of attachment is immaterial.

lied about it when he was asked for an explanation. However, a close review of the relevant documents reveals that the expense report in question, dated April 25, 2013, was submitted *before* the Grove Park Inn trip actually occurred on April 27-28, 2013, presumably because reservations and payments were made during the expense period relevant to the April 25, 2013 submission date. (*See* ECF No. 26-10 at 66-67.) Furthermore, the travel itinerary produced by company software and reflecting the manual name change to "William Turnipseed" was generated on April 10, 2013, more than two weeks in advance of the actual trip. (*See* ECF No. 26-10 at 73-74.) The manual change by inserting the name of a purported "guest" who did not end up attending the trip and who strongly asserts he was never invited is certainly suspicious. Nevertheless, it is the job of the *fact finder*, not the Court at summary judgment, to determine whether it was reasonable for the Board to conclude that the submission of the Turnipseed itinerary was a deliberate attempt to defraud the company (*see* ECF No. 26-17 at 2), or whether that conclusion was unreasonable because Arvanites' failure to correct a portion of the pre-generated travel plans that did not materialize was simply an innocent oversight on his part. *See Conner*, 560 S.E.2d at 611; *Prescott*, 491 S.E.2d at 705. Again, the Court declines to comment on the relative merits of this dispute.

With respect to the alleged unauthorized disclosure of confidential company information, Arvanites asserts that Hettlinger already had the financial information in question because Hettlinger served as Exopack's Vice President of Operations-Finance and worked in the company's executive offices in Chicago prior to being discharged. (ECF No. 28 at 4-5; ECF No. 28-1 ¶ 12.) Arvanites attaches an affidavit from Hettlinger, which states:

> Bob Arvanites did not give me any confidential information. I already had the preliminary numbers from my work with Exopack's financial people while I was there. What he sent me was simply confirmation. I was entitled to it in order to calculate my bonus that Exopack owed me. This benefitted Exopack by allowing the company and me to agree on the terms of my departure and avoid expensive and needless litigation.

(ECF No. 28-8 at 1.) Based on these contextual considerations, Arvanites argues that he cannot reasonably be said to have disclosed "confidential" information. (ECF No. 28 at 10.) In other words, because Hettlinger had already received the preliminary financial information when he was employed as an executive with Exopack, the information Arvanites sent him was not that which Exopack "could reasonably be expected to desire to be held in confidence." (*See* ECF No. 26-3 ¶ 1.a.)

Arvanites makes no specific argument as to why the assistance he provided to Hettlinger in the course of Hettlinger's severance negotiations should not be deemed a violation of his duties to the company under the Conduct Policy. Defendants have identified the provisions in the Conduct Policy pertaining to the duty of loyalty and conflicts of interest as most applicable to this part of the fact pattern. (*See* ECF No. 26-1 at 3.) The Conduct Policy states, "A conflict of interest exists when an employee's absolute duty to give his or her undivided business loyalty to Exopack can be affected by actual or potential personal benefit from another source." (ECF No. 26-4 at 10.) A non-exhaustive list of potential conflict-of-interest situations cites examples where an employee's direct or indirect financial interest or receipt of a gift might compromise the employee's business loyalty to Exopack due to the employee's or a relative's relationship with potential customers, suppliers, or competitors of Exopack. (*Id.*) In the Court's view, the examples provided for what would constitute a conflict of interest are not directly on point to the type of assistance to a former fellow executive that Arvanites

provided to Hettlinger. Arvanites stood to gain no actual or potential personal benefit from drafting an email on Hettlinger's behalf. A rational fact finder could come down on either side of the question of whether the Board was reasonable in finding a conflict of interest here. The duty of loyalty is expressed in more general terms in the Conduct Policy, which states, *inter alia*, "you are required to devote your full working time, talents, skills, and energies to the furtherance of Exopack's legitimate business goals and objectives, and you are required <u>not</u> to engage in activities that compete with Exopack or otherwise are not in the best interests of Exopack or its businesses or activities." (*Id.* at 6 (emphasis in original).) This section, entitled "Loyalty to Exopack," actually references the "Conflicts of Interest" provision as providing more detail on what the duty of loyalty specifically requires. (*See id.*) There is a colorable argument that the expansive language describing the duty of loyalty set forth in the Conduct Policy was not intended to capture conduct of the type exhibited here, namely, drafting an email for a friend and former colleague to try and help him get a few extra month's severance pay. A rational fact finder could plausibly find that the Board's conclusion that Arvanites violated his duty of loyalty was unreasonable.

Plaintiff roundly discounts Defendants reliance on his own deposition testimony as purported "admissions" of the misconduct in question. He argues that such reliance is misguided because (1) Exopack's counsel did not show him the entire Separation Agreement, Confidentiality Agreement, or Conduct Policy, but only asked him about piecemeal portions from each document; (2) Exopack's counsel did not present all of the relevant evidence to Arvanites about the subject matter of the questioning; and (3) Exopack asked Arvanites to testify about ultimate conclusions regarding his alleged

breach of the various policies, and he is a layperson not a contract lawyer. (ECF No. 28-at 7-8.) At least with respect to Arvanites' testimony about breaching a duty of loyalty by helping negotiate higher severance pay and breaching a duty of confidentiality by sending out financial information, the Court finds the third point persuasive. Of course, it is entirely possible that these "admissions" may end up destroying the credibility of Arvanites' claim that he did nothing wrong by sending Hettlinger the financial information and drafting an email requesting more severance on his behalf. But that is a determination to be made by the fact finder at trial.

Finally, Arvanites challenges the legitimacy of the Cause determination by citing the fact that when he applied for unemployment benefits, Exopack did not challenge his request and did not indicate that he was fired for Cause. (*See* ECF No. 28-1 ¶ 8 and Ex. C.)

As always, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-248 (emphasis in original). And "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). The material fact that remains in dispute is whether the Board of Directors' decision to fire Arvanites for Cause was made in good faith and was reasonable. Pregnant within that dispute are numerous sub-disputes over the inferences to be drawn from Arvanites' conduct and certain actions taken by Exopack personnel during

the course of the investigation. The Court finds that Plaintiff has raised enough doubt about the accuracy of the conclusions drawn during the investigation, and the motivation that initiated the investigation in the first place, to preserve a genuine issue for trial, because the evidence is such that reasonable fact finder could plausibly return a verdict in his favor. *Anderson*, 477 U.S. at 247. Accordingly, the Court denies Defendants' Motion for Summary Judgment regarding Plaintiff's first cause of action.

## Declaratory Judgment

Plaintiff's second cause of action seeks a declaratory judgment that certain stock options granted to him upon his rehiring (*see* ECF No. 26-5) are fully vested and that his rights to the those stock options continue to exist and are unimpaired. (Compl., ECF No. 1-1 ¶¶ 20-26.) Exopack argues in its Motion that pursuant to the plain language of the Stock Option Agreement, Plaintiff's stock options were not vested at the time of his termination. (ECF No. 26-1 at 17-18.) Plaintiff admitted as much in his deposition. (Arvanites Dep., ECF No. 26-18, p. 49, ll. 3-6.) In his Response, Plaintiff expressly concedes that he is not entitled to payment for the stock options and submits that no further argument on this point is necessary. (ECF No. 28-1 at 1.) Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiff's second cause of action.

## Final Comments

The Court would extend a word of caution to Plaintiff regarding the survival of this case beyond the summary judgment stage. As Defendants accurately point out in their Reply, many of the factual disputes Arvanites raised in his Response are largely substantiated by his own affidavit and attachments thereto. Presumably, much of Plaintiff's case at trial will rest on his own testimony to explain the purported innocence

of his conduct and the improper bias which he claims Exopack management exhibited toward him. Should it become clear to the Court that this case survived summary judgment as a direct result of false information, material misrepresentation, or frivolous assertions provided by Arvanites, Plaintiff may find himself responsible, under the Court's inherent authority, 28 U.S.C. § 1927, and/or the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code § 15-36-10, for reimbursement of attorneys' fees and expenses incurred by Defendants in litigating this matter beyond summary judgment.

## **CONCLUSION**

After careful consideration of the parties' briefs and the relevant portions of the record, and for the reasons set forth above, the Court grants in part and denies in part Defendants' Motion for Summary Judgment (ECF No. 26).

**IT IS SO ORDERED.**

 /s/ Bruce Howe Hendricks
Bruce Howe Hendricks
United States District Judge

September 16, 2016
Greenville, South Carolina